UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| DONSURVI CHISOLM, | ) | C/A No. 4:14-4364-RBH-TER |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| JENNIFER FRANKLIN, MICHAEL McCALL, | ) | |
| AND JESSICA EDMUNDS, | ) | |
| | ) | |
| Defendants. | ) | |
| ————————————————————— | ) | |

The Plaintiff, DonSurvi Chisolm, proceeding *pro se* filed this action under 42 U.S.C. § 1983[1]

on November 13, 2014, alleging violations of his constitutional rights. Plaintiff filed an amended

complaint on April 28, 2015. (Doc. #23). Plaintiff filed a motion for summary judgment on August

17, 2015. On September 2, 2015, Defendants filed a motion for summary judgment (doc. #48) and

a response to Plaintiff's motion for summary judgment. Because Plaintiff is proceeding pro se, he

was advised on or about September 2, 2015, pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir.

1975), that a failure to respond to the Defendants' motion for summary judgment could result in

dismissal of his complaint. Plaintiff filed a response on September 28, 2015. Defendants filed a reply

on October 7, 2015. Plaintiff filed a sur-reply on October 19, 2015. (Doc. #55).


**STANDARD FOR SUMMARY JUDGMENT**

The federal court is charged with liberally construing the complaints filed by pro se litigants,

---

[1]All pretrial proceedings in this case were referred to the undersigned pursuant to the
provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d),DSC. Because
this is a dispositive motion, the report and recommendation is entered for review by the District
Judge.

to allow them to fully develop potentially meritorious cases. See Cruz v. Beto, 405 U.S. 319 (1972); Haines v. Kerner, 404 U.S. 519 (1972). The court's function, however, is not to decide issues of fact, but to decide whether there is an issue of fact to be tried. The requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts which set forth a federal claim, Weller v. Dep't of Social Servs., 901 F.2d 387 (4th Cir. 1990), nor can the court assume the existence of a genuine issue of material fact where none exists. If none can be shown, the motion should be granted. Fed. R. Civ. P. 56(c).

The moving party bears the burden of showing that summary judgment is proper. Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof. Celotex, 477 U.S. 317. Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial. Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986). The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir.

1992).  The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits."  Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings.  See Celotex, 477 U.S. at 324 (Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves).  Rather, the party must present evidence supporting his or her position through "depositions, answers to interrogatories, and admissions on file, together with ... affidavits, if any." Id. at 322; see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## DISCUSSION

## ARGUMENT OF PARTIES/ FACTUAL ALLEGATIONS

Plaintiff alleges that Ms. Franklin (Franklin), the Postal Director at McCormick Correctional Institution (MCI), violated his constitutional rights by interfering with his mail correspondence. (Amended complaint, doc. #23). Specifically, Plaintiff asserts that on July 28, 2014, a letter he attempted to mail was forwarded to the Correspondence Review Committee (CRC) by Franklin after she deemed the Spanish content questionable since she "could not translate." (Id.).  Plaintiff alleges that this is not SCDC policy. (Id.). Franklin scrutinizes mail from the Special Management Unit (SMU) where he was housed from July 24, 2014, until February 14, 2015, while not strictly scrutinizing the mail from the general population. (Id.). Plaintiff sent several Request to Staff between August 13, 2014, and September 22, 2014, complaining about the issues he was having with the mailroom and the apparent discrimination of the Spanish language. (Id.). On September 10,

2014, Franklin's supervisor, J. Edmond[2], informed him that his Spanish content letter dated July 28, 2014, had been approved by CRC and that no letters were pending review at that time. (Id.). However, Plaintiff contends that there should have been two letters under review, one in English and one in Spanish. (Id.). This was the first instance of missing mail on the record. (Id.). When Plaintiff inquired of Franklin as to the whereabouts of his approved Spanish content letter, her response was that it had been mailed on September 12, 2014. (Id.). Plaintiff should have been informed upon CRC approval on September 10, 2014. (Id.). Plaintiff alleges that the person he mailed the letter to, Natalia Chisolm, never received the mail. (Id.).

Plaintiff alleges he sent a Request to Staff Member J. Edmond in the month of September 2014, concerning the fact that his legal mail was opened outside of his presence, but the issue was ignored. (Id.). As of October 10, 2014, there were four missing letters to/from Natalia Chisolm and one to Latoya Nieves. (Id.). The letter to Nieves was important because it asked her to "request Buddhist material from the SYDA foundation" on his behalf since his previously attempted contact with the SYDA had failed because his letters were in Spanish. (Amended complaint at 4). On November 7, 2014, the mail clerk refused to take his mail during morning mail pickup from SMU and his grievance on this matter was denied. (Amended complaint). Plaintiff alleges that on November 10, 2014, a letter containing Spanish content from Ejuhauna and Elan Chisolm was never received. (Id.).

On November 12, 2014, Plaintiff alleges Franklin refused to debit his account in order to apply postage to legal mail addressed to General Counsel/S.C. Budget and Control Board stating that

---

[2] In the caption the name is spelled Edmunds. However, it appears that the correct spelling is Edmond.

4

he did not have sufficient funds when he had at least five dollars in his account; that on December 8, 2014, his legal mail was held from him until Franklin returned to work from a day off; and, that on December 12, 2014, letters addressed to Natalia Rivera Chisolm and Ingrid Carreso were forwarded to CRC for review citing the reason as being "questionable content cannot translate." (Doc. #23 at 5). Plaintiff asserts that he sent a Request to Staff addressed to Franklin and Edmond addressing the issue of Spanish discrimination and interference with his beliefs. (Id.). The response was that they were following policy. In January 2015, Franklin started enforcing the rule that SMU inmates were only allowed to mail two envelopes a month. (Id.). Plaintiff alleges he grieved the fact that Franklin was forcing SMU inmates to send legal mail to her so she could scan/read it out of their presence. (Id.). On February 10, 2015, the first SYDA correspondence studies material was received by the McCormick mailroom but was withheld from him due to his SMU status. (Id.).

Chisolm alleges that he asked the Chaplain at MCI on two occasions if he could provide him with Buddhist material but never received any so he "had no other means of obtaining material or, to study his beliefs' texts." (Id. at 6). It is common for inmates to mail letters for other inmates but that Franklin refused to mail a letter from one of the inmates addressed to Chisolm's family on February 11, 2015. (Amended complaint). On February 12, 2014, when Plaintiff was returned to general population, he requested the SYDA material from Franklin who immediately forwarded it to the CRC for review for questionable content since she could not translate. (Id.). Plaintiff alleges that another inmate at MCI received at least three publications from the SYDA foundation without delays because his was written in English not Spanish. (Id.). As of April 5, 2015, Plaintiff had not been able to attend Buddhist services offered to the general population and had not received any Buddhist material. (Id.). The CRC review of letters is given a ninety day time frame excluding

5

holidays and weekends which means it can take up to 120 days for a letter to be translated and mailed. (Id.). Thus, this would leave a "Spanish speaking person with roughly 4 opportunities a year to contact his family after his letters are screened." (Id. at 8 ). Plaintiff alleges that Director Michael McCall approves all SCDC policy. (Id.). Plaintiff requests a preliminary and permanent injunction ordering Defendants to stop their discrimination of the Spanish language and to uphold his religious rights and monetary damages.[3]

Plaintiff attached declarations to his motion for summary judgment from other inmates stating that they wrote letters in their native language that was not sent to CRC for review. (Doc. #45). For example, one is the declaration of Daniel Lopez stating that he was housed at the MCI and wrote letters in his native tongue/language to his mother on four occasions, and they were not forwarded to the CRC for review. Lopez asserts that he has also received letters written in Spanish. (Doc. #45-1 at 18). Plaintiff submitted a sur-reply and attached a copy of a log sheet with the heading "South Carolina Department of Corrections, Office of General Counsel, legal/privileged/certified mail delivery log" (Doc. #55-1 at 3). On December 18, 2014, it is logged on this form that Plaintiff received mail from the general counsel for the State Budget and Control

---

[3] Any claims by Plaintiff for injunctive relief should be denied. The issuance of an injunction as requested by the Plaintiff would undermine prison officials' ability to effectively manage prisons and maintain order and discipline. Cf. Taylor v. Freeman, 34 F.3d 266, 269-270 (4th Cir. 1994) (holding preliminary injunctive relief involving the management of prisons should be granted only under exceptional and compelling circumstances). The public interest weighs in favor of policies which encourage security in prisons. Nicholas v. Ozmint, No. 05-3472, 2006 WL 2711852, * 5 (D.S.C.Sept.20, 2006). The court must give deference to decisions by prison administrators. See Wetzel v. Edwards, 635 F.2d 283, 288 (4th Cir.1980).

Additionally, the standard articulated in Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008), governs the issuance of preliminary injunctions. See Real Truth About Obama, Inc. v. Fed. Election Comm'n, 607 F.3d 355 (4th Cir.2010) ( per curiam). Plaintiff has failed to satisfy the four requirements as set out in Winter, supra.

Board which Plaintiff argues supports his claim that mail to the South Carolina Budget and Control Board is considered legal mail. Id.

Defendants submitted affidavits in support of their motion for summary judgment. In the affidavit of Jessica Edmond, she avers that she is employed with the SCDC and is currently the Agency Mailroom Coordinator for SCDC having held this position since June 17, 2014. (Doc. #48-4). Edmond's office is at SCDC headquarters in Columbia not MCI. (Id.). As the Agency Mailroom Coordinator, she supervises the mailroom staff at all SCDC institutions but is not part of the Correspondence Review Committee (CRC) in Columbia.  (Id.). Prior to her current position, all letters in any foreign language were sent to CRC for review because they were unable to be translated and understood by mailroom staff.  (Id.). Since being promoted to her position as the Agency Mailroom Coordinator, she has reviewed the policy and procedure concerning mail written in a foreign language, and recently informed mailroom staff to no longer forward mail written in a foreign language to CRC for review unless they observe matters that might present a security threat or interfere with the normal operations of the institution.  (Id.). Edmond recalls Plaintiff's name but does not recall any specific interactions with him, does not recall receiving any Requests to Staff, and has not been able to locate a copy of any such Requests as she receives numerous Requests to Staff on a daily basis.  (Id.). Edmond works in Columbia and oversees operations of the mailroom staff at SCDC institutions.  (Id.). Edmond has no authority to solely make or otherwise establish SCDC policies, is not involved in the day-to-day activities, such as religious services, and has never interfered with Plaintiff's religious activities.  (Id.). Edmond does not unilaterally issue a policy restricting inmates on the SMU from receiving publications while housed in SMU (now referred to as Restrictive Housing Unit (RHU)).  (Id.).

Defendants submitted the affidavit of Michael McCall who attests that he is currently the Deputy Director of Operations for SCDC, but was previously the Warden at Perry Correctional Institution and at Lee Correctional Institution having never worked at MCI. (Doc. #48-5).  McCall has had no involvement with and has no direct knowledge concerning Plaintiff's mail or religious activities while he was housed at MCI.  (Id.). As Deputy Director of Operations, McCall may review policies and provide input into policies that apply to all institutions within SCDC, but he does not have the authority to solely establish policies.  (Id.).  McCall asserts that he did not unilaterally issue a policy restricting inmates on the SMU from receiving publications while housed in SMU.  (Id.). McCall does not recall having any interactions with Plaintiff and is not involved in the day-to-day activities such as mail and religious services with the SCDC institutions.  (Id.).

Defendants submitted the affidavit of Jennifer Franklin (Franklin) who attests that she is an employee of the SCDC currently employed as Postal Director at the MCI where she works in the mailroom. (Franklin affidavit, doc. # 48-3).  Part of Franklin's job responsibilities is to monitor incoming and outgoing mail, process incoming and outgoing legal mail, and process debits and restitutions for postage. (Id.). Franklin has no authority to make or otherwise establish SCDC policies. (Id.). If an inmate receives mail that is marked as legal mail, an order to report is sent to the inmate who must sign for the legal mail. (Id.). An exception is made if the inmate is housed in the SMU/RHU where the legal mail will be delivered to the inmate by an officer, but the inmate is still required to sign for the legal mail. (Id.). Regular inmate mail, both incoming and outgoing, is scanned for contraband or other security concerns. (Id.). If any are suspected after scanning the mail, the mail may be read to further determine if it contains contraband or presents a security risk. (Id.). If it does, then the mail is either forwarded to security personnel or to the Correspondence Review

8

Committee ("CRC") in Columbia for review. (Id.). Letters or other material in a foreign language were previously sent to the CRC for review but this would not have been done with every letter that contained any type of writing in Spanish or another language. (Id.). However, if an inmate sent a letter which was completely or partially in another language that could not be understood by mailroom personnel it would have been sent to the CRC for review. (Id.). Franklin was recently informed by Jessica Edmond, the Agency Mailroom Coordinator, that letters written in Spanish or other foreign languages should no longer be sent to the CRC for review unless other matters that might present a security threat or interfere with the normal operations of the institution are observed within the correspondence. (Id.).

Plaintiff wrote a letter on July 25, 2014, to an individual and discussed in that letter a cell phone and drugs which was deemed to be possible criminal activity. (Id.). Franklin reported the letter to the Major at MCI and sent the letter to CRC for review. (Id.). Franklin has no authority to reject the letter herself, but must send any questionable mail to CRC for review for a determination of whether it can be mailed. (Id.). If mail is sent to the CRC for review, the inmate sending the mail is notified that it has been sent to the CRC. (Id.). Based on review of records, Plaintiff was notified that his July 25, 2014, letter was sent to the CRC. (Id.). On July 28, 2014, the Plaintiff wrote a letter to the same person at the same address as his July 25, 2014. (Id.). However, the July 28, 2014, letter was written partially in English and partially in Spanish. (Id.). Franklin did not recall Plaintiff sending any mail written in Spanish prior to this date. (Id.). Being unable to scan or read Plaintiff's letter for security concerns, she forwarded the letter to the CRC on July 28, 2014, for review as all mail was done at that time. (Id.). The letter was approved by the CRC on September 9, 2014, Franklin deposited the letter in the U.S. Postal Service on September 12, 2014, and notified the

Plaintiff that the letter had been mailed. (<u>Id</u>.). Franklin attests that it is her recollection that Plaintiff attempted to send or receive several letters written in Spanish after his July 28, 2014, letter, and those letters were sent to CRC for review. (<u>Id</u>.). Based on the records, it appears that all of Plaintiff's mail sent to the CRC for review were approved by the CRC and then deposited into the U.S. Postal Service if outgoing mail or delivered to Plaintiff if incoming mail. (<u>Id</u>.). Franklin asserts that she has not discriminated against Plaintiff by sending his letters written in Spanish to the CRC for review as she understood that the material she could not read or translate were to be forwarded to the CRC. (<u>Id</u>.). This procedure was changed in April 2015 concerning mail written in a foreign language and from that time forward, the mailroom has been informed that mail written in foreign languages should not be sent to the CRC unless there is another reason to believe it contains contraband or other concerns.  (<u>Id</u>.). Franklin attests that once correspondence is deposited into the U.S. Postal Service by mailroom staff, the staff is no longer responsible for the delivery of the mail. (<u>Id</u>.). If Plaintiff sent outgoing mail that passed the initial scan and was not sent to CRC, then it would have been mailed out the day it was delivered to the mailroom. (<u>Id</u>.). Franklin has noway of tracking mail once it is sent from the mailroom to the U.S. Postal Service for delivery, and they receive a high volume of mail each day. (<u>Id</u>.).

Generally, when inmates send out non-legal mail, there is no record of the mail if no contraband or security concerns are detected after the initial scan, and there is no record for incoming non-legal mail. (<u>Id</u>.). Some records are kept for outgoing legal mail but those records do not include where the mail is being sent. (<u>Id</u>.). Between incoming and outgoing mail, the MCI mailroom receives over two hundred pieces of mail per day, and she does not recall every piece that comes through the mailroom. (<u>Id</u>.). As to Plaintiff's allegations that he sent Franklin several

10

Requests to Staff between August 13, 2014, and September 22, 2014, regarding his mail, she does not recall receiving them. (Id.). There are over twelve hundred inmates at MCI and she receives numerous Requests to Staff every day. So while it is possible that Plaintiff sent her a Request to Staff during said time period, she does not recall and cannot find a record of any. (Id.). As to Plaintiff's allegations that he asked Franklin about missing letters on October 10, 2014, she does not recall that the conversation occurred, but found a record of a Request to Staff to her from Plaintiff dated October 10, 2014, wherein Plaintiff requested that his mail be sent. (Id.). Franklin checked and Plaintiff had no pending mail. As to the allegations that Franklin refused to mail a letter from inmate Timothy Lemack addressed to members of Plaintiff's family on February 11, 2015, she does not recall the particular incident but does have a record that Plaintiff sent her a Request to Staff dated February 11, 2015. (Id.). However, inmates are not allowed to send out mail for another inmate, and an inmate is not allowed to attempt to send mail to another person who would then send to an individual in another prison. (Id.).

Legal mail is defined by SCDC policy as mail sent out to, or received from, officials of federal, state, and local courts, attorneys, court clerks, judges, legal aid societies such as the American Civil Liberties Union, attorneys authorized representative, the South Carolina Attorney General, the United States Attorney General, and SCDC Office of General Counsel. (Id.). When an inmate receives legal mail, it will be opened and inspected in the presence of the inmate by mailroom staff or their designee. Also, outgoing legal mail is submitted to the mailroom in a sealed envelope while non-legal mail must be submitted unsealed. (Id.). Franklin does not open legal mail for inmates housed in RHU/SMU, but instead an officer is designated to deal with legal mail for RHU/SMU inmates. (Id.). The officer will give the RHU/SMU inmates a legal log to sign and once

the inmate signs the log and returns it to the officer, the officer will then open the mail and scan it for contraband, but not content. (<u>Id</u>.). If no contraband is discovered, the officer will give the legal mail to the RHU/SMU inmate. (<u>Id</u>.).

Franklin does not recall an incident where she opened Plaintiff's legal mail. <u>Id</u>. However, if an inmate receives mail and the envelope does not state it is from an attorney, then mailroom personnel will open the mail as it is presumed to be non-legal, regular mail. (<u>Id</u>.). Some attorneys only put their name and address on the envelope and do not identify that they are attorneys or place any other indication on the envelope that it is legal mail. (<u>Id</u>.). If there is no indication on the envelope that the letter is from an attorney, then mailroom personnel will open this mail and scan it for contraband as it is presummed to be non-legal mail. (<u>Id</u>.).

Based on a review of Plaintiff's records, Plaintiff did receive mail from the Strom Law Firm on December 4, 2014. (<u>Id</u>.). This was considered legal mail because it was from an attorney, and Plaintiff did sign for the legal mail, but the officer in RHU/SMU brought the mail to Franklin for review because it contained a keychain, which is considered contraband. (<u>Id</u>.). Franklin rejected the keychain as contraband, but allowed Plaintiff to receive the legal mail. (<u>Id</u>.). As to Plaintiff's allegations that officers refused to deliver legal mail to him in SMU on December 8, 2014, Franklin does not recall an incident where she refused to pick up or deliver Plaintiff's mail. (<u>Id</u>.). Generally, mail is picked up and delivered even if Franklin is not working, and she does not recall an incident on December 8, 2014, where Plaintiff's mail was not delivered. (<u>Id</u>.). However, Franklin avers that it could have been that the officers were unclear if Plaintiff could receive the mail and waited until she returned to work to make that determination. (<u>Id</u>.). Franklin does not recall said incident but has never directed anyone to withhold mail from the Plaintiff because she is not present at MCI. (<u>Id</u>.).

12

Further, SCDC will pay for postage on some items designated as legal mail even if the inmate is indigent and does not have sufficient funds to pay for postage. (Id.). As to Plaintiff's allegation that he was not allowed to send correspondence to the General Counsel S.C. Budget and Control Board on November 17, 2014, Franklin attests that mail to the S.C. Budget and Control Board is not considered legal mail. Id. Therefore, inmates would be required to pay postage. (Id.). Franklin attests that she reviewed Plaintiff's E.H. Cooper Account balance for November 17, 2014, and he had insufficient funds to pay postage at that time. (Id.). Plaintiff would not have been allowed to send mail to the S.C. Budge and Control Board on that day without sufficient postage. (Id.). Further, an inmate in RHU/SMU would not be able to use funds in his E.H. Cooper Account to send non-legal mail even if he had sufficient funds. (Id.). An inmate in RHU/SMU can only use the two envelopes per month given to them to send out non-legal mail. Mailroom personnel noticed that in order to get around the limit, inmates were obtaining and using envelopes from other inmates to send personal mail which is against SDCDC policy. (Id.). In January 2015, to confront the issue, the mailroom personnel at MCI began monitoring and keeping track of the number of envelopes that inmates housed in RHU/SMU used for their personal mail each month. (Id.). After January 2015, the mailroom personnel began recording the date inmates housed in RHU/SMU sent personal letters to prevent them from sending more than two per month. (Id.).

As to Plaintiffs allegations that mail from other inmates addressed to his family were not mailed, Franklin asserts that the mail should not have been sent because it is against policy for an inmate to have another inmate send out mail for him. (Id.). While it is possible that this has occurred, it is against policy; and, if the mailroom staff recognizes that is occurring, the mail should be refused and not mailed. (Id.).

Franklin attests that she does recall that Plaintiff received a publication from SYDA while he was on RHU/SMU and, pursuant to policy, Plaintiff was not allowed to have publications. (Id.). When Plaintiff returned to general population, the SYDA publication was sent to CRC for review because it was written in Spanish and could not be scanned for security concerns. (Id.). The CRC approved the publication and it was given to Plaintiff. (Id.). At any time, RHU/SMU inmates could have received religious materials directly from the chaplain but could not receive publications from outside sources. (Id.). Franklin contends that she did not unilaterally issue a policy restricting inmates housed in RHU/SMU from receiving outside publications. (Id.). If an inmate receives religious materials from the chaplain, the materials are not scanned by the mailroom staff for contraband or other security concerns. (Id.). Franklin does not have any control or authority over the chaplain at MCI or what materials he delivers to the inmates. (Id.). However, if an inmate receives religious materials through the mail, it will be scanned for contraband or other security concerns. (Id.). Franklin attests that she has no involvement with any religious services at MCI, has no authority or control over the chaplain, and has no authority or control over whether Plaintiff has attended or can attend any Buddhist or other religious services at MCI. (Id.). Franklin has not intentionally interfered with Plaintiff's religious activities. (Id.).

## ANALYSIS

### Access to courts/legal mail/non-legal mail

Plaintiff's claims of withholding or tampering with his legal mail, fail. As to Plaintiff's allegations that his legal mail was opened, Franklin averred that Plaintiff received legal mail on December 4, 2014, and he signed for it. However, the officer in RHU/SMU carried the mail to

14

Franklin for review because it contained a keychain, which was considered contraband. Plaintiff did receive his legal mail from the law firm the next day but not the keychain. Also, Plaintiff asserts that Franklin would not mail a letter to the South Carolina Budget and Control Board which he claimed was legal mail. However, pursuant to SCDC policy, mail addressed to the South Carolina Budget and Control Board is not considered legal mail. (See Franklin affidavit). Legal mail is defined by SCDC policy as mail sent out to, or received from, officials of federal, state, and local courts, attorneys, court clerks, judges, legal aid societies such as the American Civil Liberties Union, attorneys authorized representatives, the South Carolina Attorney General, the United States Attorney General, and SCDC Office of General Counsel. Id. Therefore, mail to the South Carolina Budget and Control Board was not considered legal mail pursuant to SCDC policy, and Plaintiff fails to make a showing otherwise.

Additionally, the Plaintiff's allegations that the Defendants interfered with his legal mail fail to state a claim because he has not shown any actual injury. To state a claim that a delay or failure in delivering or receiving legal mail violated an inmate's constitutional rights, the prisoner must allege facts showing that "the delay or failure in delivering his legal mail deprived him of meaningful access to the courts." White v. White, 886 F.2d 721, 723 (4th Cir.1989). Accordingly, the plaintiff must show that the alleged "interference with his legal mail caused him to suffer actual detriment to a legal proceeding." Williams v. Crawford, 339 F. App'x 288, 289 (4th Cir.2011) (citing Lewis v. Casey, 518 U.S. 343, 349–51, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996) (holding that a prisoner must show some actual injury resulting from a denial of access in order to allege a constitutional violation). Further, to the extent Plaintiff intended to imply that the alleged conduct with respect to his legal mail has affected his access to the courts, Plaintiff has provided no evidence,

or even argument, to show that any problems he is allegedly having with his legal mail has prejudiced him in any court proceeding. Magee v. Waters, 810 F.2d 451, 452 (4th Cir.1987) ("Courts have required a showing by a complaining prisoner of actual injury or specific harm to him before a claim of lack of access to the courts will be sustained"); Hause v. Vaught, 993 F.2d 1079, 1084–1085 (4th Cir.1993); Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir.1996) (Dismissal of access to court claim proper where inmate relied on conclusory allegations and failed to identify any actual injury). Plaintiff fails to allege specific facts indicating a pending non-frivolous legal case, or any other legal matter, has been adversely affected. Therefore, it is recommended that Defendants' motion for summary judgment be granted with respect to this claim.[4]

Plaintiff's claims that Defendants' actions in restricting his non-legal mail by sending it to the CRC for review of the Spanish language violated his constitutional rights, fail. As a prison inmate, Plaintiff retains certain First Amendment rights. Thornburgh v. Abbott, 490 U.S. 401, 407–408, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989). However, an inmate's constitutional rights are not unrestricted. Prisons may adopt regulations that infringe upon an inmate's constitutional rights as long as the regulations are "reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 87, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). The court must consider four factors in determining whether the regulation relied on by Defendants is constitutionally permissible: (1) whether the disputed regulation is logically connected to the legitimate government interest invoked to justify it; (2) whether the inmate has alternative means of exercising the right in question; (3) the

---

[4] As to any allegations involving the grievance procedure, the claim fails as there is no constitutional right to participate in grievance proceedings. Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994).

impact that accommodation of the asserted right would have on other inmates, prison officials, and the allocation of prison resources; and (4) whether there is a ready alternative that would fully accommodate the inmate's rights. Turner, 482 U.S. at 89–90. In applying these factors, the court must "respect the determinations of prison officials." United States v. Stotts, 925 F.2d 83, 86 (4th Cir.1991). The plaintiff bears the ultimate burden of establishing that a prison regulation is unconstitutional. Hause v. Vaught, 993 F.2d 1079, 1082 (4th Cir.1993). As presented in the affidavits submitted by the Defendants, any mail written in a foreign language, in full or partially, that could not be translated by the mail staff at MCI was sent to the CRC for review of content for contraband for security purposes. All of Plaintiff's letters were approved by the CRC and either placed in the mail or, if incoming, delivered to the Plaintiff. Additionally, after Jessica Edmond was promoted to the position of Agency Mailroom Coordinator for the SCDC on June 17, 2014, she avers that she reviewed the policy and procedure concerning mail written in a foreign language and informed the mailroom staff to no longer forward such mail to the CRC for review unless they observe matters that might present a security threat or interfere with the normal operations of the institution. (Doc. #48-4 at ¶4).[5] Plaintiff fails to show how SCDC policy and actions were/are unconstitutional. Accordingly, it is recommended that Defendants' motion for summary judgment be granted with respect to this claim.

---

[5] Further, occasional incidents of delay or nondelivery of mail "do not rise to a constitutional level." Gardner v. Howard, 109 F.3d 427, 430–31 (8th Cir.1997); Smith v. Maschner, 899 F.2d 940, 944 (10th Cir.1990). Mere negligent interference by prison officials with an inmate's right to access to the courts does not state a cause of action under section 1983. Pink v. Lester, 52 F.3d 73, 75–76 (4th Cir.1995).

**Equal Protection/Discrimination**

Plaintiff's claims of equal protection/discrimination based on the fact that his letters written in Spanish were sent to the CRC for review, fail. "To succeed on an equal protection claim, a plaintiff must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." Morrison v. Garraghty, 239 F.3d 648, 654 (4th Cir.2001). "Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." Id. A prisoner can make an equal protection claim if he is singled out as an individual for "arbitrary and irrational treatment," with no rational basis for such disparate treatment, even if one is not being discriminated against as a member of a certain group. See Village of Willowbrook v. Olech, 528 U.S. 562, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000); Willis v. Town of Marshall, N.C., 426 F.3d 251, 263 (4th Cir.2005). When equal protection challenges arise in a prison context, courts must adjust the level of scrutiny to ensure that prison officials are afforded the necessary discretion to operate their facilities in a safe and secure manner. Veney v. Wyche, 293 F.3d 726, 730–32 (4th Cir.2002).

All mail written in Spanish[6], in whole or in part, was not forwarded to the CRC. Not every letter that contained any type of writing in Spanish or another foreign language would have been sent to the CRC for review. (See Franklin Aff., p. 2). Mail written in Spanish, in whole or in part, that could not be interpreted or understood was forwarded to the CRC for review. Therefore, Plaintiff fails to show all similarly situated were treated differently and has not shown that

---

[6] It is assumed that Plaintiff classifies the group to which he belongs as those that write letters in a foreign language. This alone does not demand a heightened scrutiny.

forwarding mail to the CRC that the mail staff was unable to translate for review of contraband or if it presented a security risk was not reasonably related to a legitimate penological interest. Additionally, Plaintiff has failed to allege or show that the alleged unequal treatment was the result of intentional or purposeful discrimination by the Defendants.[7] Therefore, it is recommended that Defendants' motion for summary judgment be granted with respect to this claim.

**Religious Publications/RLUIPA**

As to Plaintiff's allegations that his constitutional rights were violated when his requested publication materials in relation to Buddhism were sent to the CRC for review, that the publications were withheld because he was in RHU/SMU, and that the Chaplain did not furnish him Buddhist materials, fail.

Defendants assert that inmates housed in the SMU/RHU are not permitted to receive or allowed to have  publications from outside sources because of their classification and that these restrictions apply to all SMU/RHU inmates. Defendants have provided the affidavit of Franklin, the postal director/mailroom supervisor at MCI, who avers that mail is processed in accordance with SCDC Policy which provides that inmates housed in SMU/RHU are not permitted to receive or allowed to have publications from outside sources. It appears here that Defendants followed the applicable prison regulations.

Plaintiff does not contend that SCDC Policy with regards to publications in SMU/RHU fails

---

[7] "To succeed on an equal protection claim under  1983, a plaintiff must demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination." <u>Morrison v. Garraghty</u>, <u>supra</u>.

to meet some penological interest or that no alternative avenues remain open for him to exercise his First Amendment rights. At any time, SMU/RHU inmates could receive religious materials directly from the chaplain but could not receive publications from outside sources.  (Id. at ¶31-33). The burden of proof is not on Defendants to prove the validity of prison regulations; rather, the burden is on Plaintiff to disprove it. See Overton v. Bazzetta, 539 U.S. 126, 132, 123 S.Ct. 2162, 156 L.Ed.2d 162 (2003). Plaintiff has failed to do so in this case. Accordingly, Defendants' motion for summary judgment should be granted as to this claim.

As to any allegations by Plaintiff that his rights were violated under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), such claim fails. RLUIPA prohibits the government from using a land use regulation to 'impose a substantial burden on the religious exercise of a person" unless that restriction "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S .C. § 2000cc–1. In this case, Plaintiff has failed to demonstrate that the policies at MCI imposed a substantial burden on his exercise of religion. Inmates housed in SMU/RHU are not allowed outside publications. Plaintiff was allowed to receive or request religious materials from the chaplain. When Plaintiff returned to the general population, he received the SYDA publication once it was reviewed and approved by the CRC since it was written in Spanish.[8] Therefore, it is recommended that Defendants' motion for summary judgment be granted with respect to this claim.

---

[8]Plaintiff alleges that he requested materials from the chaplain but never received any. Defendant Franklin does not have any control or authority over the Chaplain at MCI or what materials he delivers to inmates and has no involvement with any religious services at MCI. The chaplain is not a named defendant.

## SUPERVISORY LIABILITY

Defendants argue that Defendants Edmond and McCall cannot be held liable as a matter of law in any supervisory capacity for any acts of others over which they had no control.

Viewing the Complaint in the light most favorable to Plaintiff, and liberally construing the Complaint, Plaintiff has failed to plead sufficient allegations to state a claim against Defendants. Edmond is the Agency Mailroom Coordinator for SCDC and oversees operations of the mailroom staff at all SCDC institutions but does not unilaterally make policy. Defendant McCall is the Deputy Director for Operations for SCDC and does not recall having any interactions with Plaintiff. Further, while McCall can review policies that apply to all institutions as the Director of Operations, he does not have the authority to solely establish policies. If Plaintiff has named any Defendant due to his/her supervisory positions, the claim fails. Because there is no doctrine of respondeat superior in § 1983 claims, Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 691–94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), a defendant is liable in his individual capacity only for his personal wrongdoing or supervisory actions that violated constitutional norms, see Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir.1994) (setting forth elements necessary to establish supervisory liability under § 1983). A plaintiff must establish three elements to prevail under § 1983 on a theory of supervisory liability under § 1983: "(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,'; and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." Shaw v. Stroud, 13 F.3d 791, 799 (4th

21

Cir. 1994) (citations omitted).  As discussed above, Plaintiff has failed to plead facts sufficient to establish that Defendants are liable under a theory of supervisory liability. [9]

## QUALIFIED IMMUNITY

Defendants argue that even assuming they violated Plaintiff's constitutional or statutory rights, which they deny, they are entitled to qualified immunity pursuant to Harlow v. Fitzgerald, 457 U.S. 800 (1982).

When a person is sued in his individual capacity, the court may consider whether that person is entitled to immunity from suit.  Immunity is a defense to be asserted by the defendant and the burden of proving entitlement to immunity rests with the defendant asserting it.  Once asserted, however, the court should carefully consider whether the person is entitled to either absolute immunity (judicial and quasi-judicial, legislative) or qualified immunity.  Once raised, immunity is a threshold issue, which should be addressed early in the action because if it can be shown to be a valid defense, the defendant is entitled to dismissal or summary judgment.  For that reason, the issue of immunity should be addressed before discovery is allowed.

---

[9] On August 17, 2015, Plaintiff filed a second motion to amend his complaint to substitute Bryan Stirling for Defendant Michael McCall as he is the Director of SCDC. (Doc. #44). Plaintiff alleges Stirling as Director has authority to create and amend policies. The allegations against Defendant McCall and/or Mr. Stirling is that they are liable because of their supervisory positions and not because of specific and personal acts against Plaintiff.  Because the resolution of the summary judgment motion may moot the Plaintiff's second motion to amend, the motion to amend the amended complaint was not ruled upon until ruling upon the motion for summary judgment.

A  district court may deny a party's motion to amend if allowing the amendment would be futile.  See Foman v. Davis, 371 U.S. 178, 182 (1962) ("Absent any dilatory motive, undue cause for delay, repeated failures to cure deficiencies by amendments, futility of amendment, or undue prejudice to the opposing party, leave to amend should be liberally given."); and In re PEC Solutions, Inc. Sec. Litig., 418 F.3d 379, 391 (4th Cir. 2005) ("Leave to amend need not be given when amendment would be futile.").  Additionally, the motion is outside of the deadline set forth in the court's scheduling orders. It is recommended that Plaintiff's second motion to amend (doc. #44) be denied.

> The doctrine of qualified immunity attempts to reconcile two potentially conflicting principles: the need to deter government officials from violating an individual's federal civil rights and the need for government officials to act decisively without undue fear of judicial second guessing.

Akers v. Caperton, 998 F.2d 220, 225-26 (4th Cir. 1993).

The Supreme Court in Harlow v. Fitzgerald, 457 U.S. 800 (1982), established the standard which the court is to follow in determining whether defendant is protected by this immunity.

> Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

Harlow, 457 U.S. at 818. In a discussion of qualified immunity, the Court of Appeals for the Fourth Circuit stated:

> Qualified immunity shields a governmental official from liability for civil monetary damages if the officer's "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." "In determining whether the specific right allegedly violated was 'clearly established,' the proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged." Moreover, "the manner in which this [clearly established] right applies to the actions of the official must also be apparent." As such, if there is a "legitimate question" as to whether an official's conduct constitutes a constitutional violation, the official is entitled to qualified immunity.

Wiley v. Doory, 14 F.3d 993 (4th Cir. 1994) (internal citations omitted), cert. denied, 516 U.S. 824 (1995). As discussed above, the Plaintiff fails to show that the Defendants violated any of his clearly established constitutional or statutory rights. Therefore, Defendants are entitled to qualified immunity in their individual capacity. Thus, the undersigned recommends that the Defendants' motion for summary judgment be granted on this issue.

## ELEVENTH AMENDMENT IMMUNITY

The Defendants contend that the Plaintiff's §1983 claims for money damages in their official capacity are barred pursuant to Eleventh Amendment Immunity. Defendants also argue that the action against them should be dismissed as a matter of law to the extent that they are sued in their official capacity because while acting in their official capacity as an employee of the SCDC they are not a "person" under 42 U.S.C. §1983 and, therefore, not subject to suit.

When a defendant is sued in his or her official capacity, the suit is frequently intended as one against the state, the real party in interest. If review of the pleadings indicates that the state is, in fact, the party being sued, then a judgment awarding damages is precluded by the Eleventh Amendment of the United States Constitution. Although declaratory and/or injunctive relief may be granted, damages may not be awarded against the state.

In the case of Will v. Michigan Department of State Police, 491 U.S. 58 (1989), the Supreme Court analyzed the interplay between § 1983 and the Eleventh Amendment of the Constitution and stated:

> Section 1983 provides a federal forum to remedy many deprivations of civil liberties, but it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties. The Eleventh Amendment bars such suits unless the State has waived its immunity (cites omitted) or unless Congress has exercised its undoubted power under § 5 of the Fourteenth Amendment to override that immunity.

The Eleventh Amendment immunity granted to the states "applies only to States or governmental entities that are considered 'arms of the State' for Eleventh Amendment purposes,"

24

but the court found that state agencies, divisions, departments and officials are entitled to the Eleventh Amendment immunity. Will, supra at 70. In reaching this conclusion, the court held that a suit against state officials acting in their official capacities is actually against the office itself, and therefore, against the state. State officials may only be sued in their individual capacities.

There is no dispute that the Defendants are/were employees of the SCDC at the time of the allegations in the complaint. Thus, they are entitled to Eleventh Amendment immunity from monetary damages in their official capacity.

## PENDENT JURISDICTION

Assuming Plaintiff's § 1983 claim is dismissed by this Court and Plaintiffs' complaint somehow can be conceived to state an additional claim for relief under any state common law theory, the undersigned concludes that such claim(s), if any, ought to be dismissed as well for want of jurisdiction. Specifically, this Court can decline to continue the action as to the pendent claims if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c).

## CONCLUSION

The Plaintiff has failed to show that the Defendants violated any of his constitutional or statutory rights under 42 U.S.C. § 1983. It is therefore, for the reasons stated herein,

RECOMMENDED that the motion filed by the Defendants (document #48) for summary judgment be GRANTED IN ITS ENTIRETY and Plaintiff's motion for summary judgment (document #45) be DENIED.

IT IS FURTHER RECOMMENDED that any other outstanding motions be deemed MOOT.


Respectfully Submitted,


s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

January 29, 2016
Florence, South Carolina

**The parties' attention is directed to the important notice on the next page.**